Joy P. ADAMS; Roger D. Wensil, Petitioners,

v.

Elizabeth H. DOLE, Secretary of Labor, Respondent,

United States Department of Energy, Intervenor.

No. 90–1747.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 1, 1990.

Decided March 5, 1991.

As Amended March 11, 1991.

Stephen Martin Kohn, argued (Michael D. Kohn, Kohn, Kohn & Colapinto, P.C., on brief), Washington, D.C., for petitioners.

William James Stone, argued, Counsel for Appellate Litigation (Robert P. Davis, Sol., Monica Gallagher, Associate Sol., Anne Payne Fugett, U.S. Dept. of Labor, Washington, D.C.; Stuart M. Gerson, Asst. Atty. Gen., Robert E. Kopp, Director, Appellate Staff, Robert S. Greenspan, John P. Schnitker, Civil Div., U.S. Dept. of Justice, Washington, D.C., on brief), for respondent.

Before RUSSELL and NIEMEYER, Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

NIEMEYER, Circuit Judge:

Roger D. Wensil and Joy P. Adams, who claim to have been discharged from their employment at the Savannah River Plant, an atomic energy facility in Barnwell, South Carolina, because of "whistle-blowing," filed complaints with the Department of Labor for retaliatory discharge under § 210 (the whistle-blower provision) of the Energy Reorganization Act (ERA), 42 U.S.C. § 5851 (1982). Because the plant is owned by the Department of Energy, the Department of Labor determined that § 210 does not apply to Wensil and Adams and dismissed the complaints for lack of jurisdiction. On petition for review of the final determination of the Secretary of Labor, we affirm.

I

Wensil worked as a pipefitter at the Savannah River Plant from February 1984 until he was dismissed on October 25, 1985. He was employed by B.F. Shaw Company, which was under contract to operate the Department of Energy-owned plant. The plant produces plutonium for the United States nuclear weapons program.

In April 1985 Wensil complained to B.F. Shaw management and to representatives of the Department of Energy that illegal drugs were being used in the area of the plant where he worked. A month later Wensil was transferred to another area of the plant, and five months later he was dismissed by B.F. Shaw as part of a reduction in force. After his dismissal, Wensil filed a complaint with the Department of Energy, contending that he had been discharged because he had reported illegal drug usage. He also filed a complaint with the Department of Labor on the same grounds. Two parallel investigations thus ensued.

In the Department of Energy an investigation was conducted by a three-member committee formed pursuant to Department of Energy Order 5483.1A, which prohibits discrimination against contract employees who complain of health and safety hazards at Department of Energy facilities. The committee found Wensil's complaints about drug usage valid but failed to find any discriminatory conduct in his discharge by B.F. Shaw. It found that Wensil was properly discharged as part of a reduction in force brought about by a decline in work and a shortage of material.

The investigation by the Department of Labor, conducted pursuant to § 210 of the ERA, led to a report of factual findings by the compliance officer that supported Wensil's contention that he was terminated because of his complaints about drug abuse at the Savannah River Plant. Before any further action was taken, however, the area director for the Wage and Hour Division of the Department of Labor, who is charged with the responsibility of receiving

and investigating complaints, advised Wensil that the National Office of the Department of Labor concluded that "after much consideration, the determination was made that Section 210 does not apply to employees of contractors at Dept. of Energy facilities." J.A. 31. Wensil appealed to the Administrative Law Judge who affirmed dismissal of the complaint on July 8, 1986.

Joy P. Adams, also an employee at the Savannah River Plant, likewise filed a complaint with the Wage and Hour Division of the Department of Labor, pursuant to § 210 of the ERA, contending that she was "illegally laid off, threatened, harassed, intimidated, terminated and otherwise discriminated against" by B.F. Shaw. J.A. 36. She contended that she was discharged by B.F. Shaw on December 31, 1986, in retaliation for her support and testimony given on behalf of Wensil. During the course of the investigations of Wensil by both the Department of Energy and the Department of Labor, she gave testimony that corroborated the claims made by Wensil. The Wage and Hour Division of the Department of Labor again refused to take jurisdiction on the ground that § 210 did not apply to Department of Energy facilities, and on appeal, the Administrative Law Judge affirmed on March 19, 1987.

Both Wensil and Adams appealed the decisions of the Administrative Law Judges to the Secretary of Labor.

After the Department of Energy dismissed Wensil's complaint, an article appeared about Wensil in the *Washington Post* entitled "Drug Whistle–Blower Fights to Regain Job," which prompted the Under Secretary of the Department of Energy to request that the Inspector General of the Department of Energy investigate the Department of Energy's actions taken with respect to the complaints of Wensil. In his report dated March 31, 1987, the Inspector General supported Wensil's claim of discrimination and concluded that he was not able to find evidence that B.F. Shaw dismissed Wensil from his job due to a decline in the workload, as concluded by the three-member committee. As a result of his findings, Wensil was reinstated in his job.

For the same reasons, Adams was offered reinstatement, but she refused.

Wensil and Adams filed three more complaints with the Department of Labor pursuant to § 210 of the ERA, arising out of subsequent events. They each filed a complaint charging that access to the Inspector General's report was denied them in retaliation for their actions. Wensil also filed a complaint that charged he was constructively discharged when he quit his employment with B.F. Shaw in September 1987. These three complaints were likewise dismissed by the Department of Labor for lack of jurisdiction.

The five complaints dismissed by administrative law judges because the Department of Labor did not have jurisdiction were consolidated for appeal before the Secretary of Labor. The Secretary issued a final decision and order dismissing all five complaints for "lack of jurisdiction." She stated that the employee protection provisions of § 210 of the ERA apply only to employees of Nuclear Regulatory Commission licensees, licensee applicants, and their contractors, and that these provisions do not apply to employees of the Department of Energy contractors, who operate facilities owned by the Department of Energy. She noted that the Department of Energy has its own "whistle-blower procedures" which in fact provided reinstatement remedies to Wensil and Adams. This petition for review followed.

II

Wensil and Adams (petitioners) contend that they are entitled to proceed under § 210 of the ERA, which is administered by the Department of Labor, because its scope reaches to protect not only employees of licensees of the Nuclear Regulatory Commission (NRC) but also employees of the contractors operating nuclear facilities owned by the Department of Energy (DOE). The Secretary of Labor and the DOE, which intervened in this case, contend that employees at DOE facilities may proceed only under DOE Order 5483.1A and that § 210 applies only to employees of NRC licensees. Because Wensil and

Adams were employees of a DOE contractor, their argument continues, the Secretary of Labor has no jurisdiction.

Petitioners would prefer to proceed under § 210 because it arguably provides a "far more powerful anti-discrimination remedy" than the DOE Order. Brief of Petitioners at 7. The DOE procedure affords no hearing process or judicial review. They note, moreover, that the DOE procedures are administered by DOE employees, creating a potential conflict of interest. Section 210, on the other hand, provides a full hearing procedure with enforcement in the federal district courts, and it makes available compensatory and punitive damages, as well as attorney's fees.

In support of their argument that § 210 of the ERA applies, petitioners rely on the plain meaning of the statute, its legislative history, and traditionally accepted rules of statutory construction. The Secretary of Labor and the DOE argue to the contrary that § 210 of the ERA is ambiguous and that therefore the legislative history and other statutory rules of interpretation should be considered. They argue that a full analysis reveals that § 210 was never intended to apply to employees at DOE facilities, but rather was limited to employees of licensees (and licensee-applicants) of the NRC. All parties concede that no court decision has addressed the issue.

■■■ As is appropriate in every case which turns on statutory construction, we

begin with the language of the statute. *United States v. Jackson*, 759 F.2d 342, 344 (4th Cir.1985). "If the intent of Congress is clear, that is the end of the matter; for the court ... must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If the statute is ambiguous, however, the question then becomes one of whether the interpretation by the agency charged with its administration is a permissible one. *Id.* at 843–44, 104 S.Ct. at 2781–82. The judiciary, in any event, is the final authority on issues of statutory construction and will reject administrative interpretations which are contrary to the clear congressional intent. *Id.* at 843, 104 S.Ct. at 2782. If the clear intent is not readily apparent from the legislative history, traditional tools of statutory construction are employed. *See National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974).

Petitioners thus argue that because the plain meaning of § 210 of the ERA is clear, no further inquiry is necessary. They argue that the statute provides simply that "no employer" may discharge or discriminate against "any employee" for engaging in activity protected by the ERA or the Atomic Energy Act of 1954.[1] They argue

1. The entire text of § 210(a) and § 210(b)(1) provides:

SEC. 210. (a) No employer, including a Commission licensee, an applicant for a Commission license, or a contractor or a subcontractor of a Commission licensee or applicant, may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee)—

(1) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this Act or the Atomic Energy Act of 1954, as amended, or a proceeding for the administration or enforcement of any requirement imposed under this Act or the Atomic Energy Act of 1954, as amended;

(2) testified or is about to testify in any such proceeding or;

(3) assisted or participated or is about to assist or participate in any manner in such a proceeding or in any other manner in such a proceeding or in any other action to carry out the purposes of this Act or the Atomic Energy Act of 1954, as amended.

(b)(1) Any employee who believes that he has been discharged or otherwise discriminated against by any person in violation of subsection (a) may, within thirty days after such violation occurs, file (or have any person file on his behalf) a complaint with the Secretary of Labor (hereinafter in this subsection referred to as the "Secretary") alleging such discharge or discrimination. Upon receipt of such a complaint, the Secretary shall notify the person named in the complaint of the filing of the complaint and the Commission.
Pub.L. 95–601, 92 Stat. 2951.

that the plain meaning of the language used evinces the intent of Congress to protect every employee engaged in activities covered by the ERA or by the Atomic Energy Act of 1954.

The Secretary of Labor and the DOE assert that it is not clear from the language of § 210 who is included in the terms "employer" and "employee," and therefore the language is ambiguous. They point out that three of the four administrative law judges who reviewed § 210 expressly found that the language was ambiguous, and the fourth interpreted the terms to have a meaning different from that claimed by the petitioners. Moreover, they argue that the "including" clause, which follows and modifies the term "employer," is susceptible to more than one meaning. The clause reads, "No employer, including a Commission licensee, an applicant for a Commission licensee, or a contractor or subcontractor of a Commission licensee or applicant, may discharge any employee...." They acknowledge that the word "including" can mean that the items that follow are merely illustrative, as contended by the petitioners. They point out, however, that the term "including" can also mean "and" or "in addition to," citing *Black's Law Dictionary* (rev. 4th ed. 1968).

We agree with the respondents that § 210 of the ERA is ambiguous when referring to those who must abide by its whistle-blowing provisions, and therefore we proceed to consideration of whether the Secretary's construction is a permissible one and not contrary to clear congressional intent.

The Atomic Energy Act was enacted in 1954 to regulate the development, use and control of atomic energy. 42 U.S.C. § 2011 (1982). Under that act facilities involved in the production of materials for nuclear weapons were to be *owned* by the Atomic Energy Commission (AEC), and nuclear facilities engaged in commercial activities were to be *licensed* by the AEC. 42 U.S.C. §§ 2061, 2133 & 2134 (1982).

In 1974 Congress enacted the Energy Reorganization Act of 1974 (ERA), Pub.L. 93–438, 88 Stat. 1233 (codified at 42 U.S.C. §§ 5801–5891 (1982)), to address comprehensively all energy issues. To improve government efficiency, it established two agencies, the Energy Research and Development Administration (later to become the DOE[2] and referred to herein also as "the DOE") and the Nuclear Regulatory Commission (NRC), to succeed to the functions of the AEC and to take on new ones. The DOE was organized to

bring together and direct federal activities relating to research and development on the various sources of energy, to increase the efficiency and reliability in the use of energy, and to carry out the performance of other functions, including but not limited to the Atomic Energy Commission's military and production activities and its general basic research activities.

42 U.S.C. § 5801(b). The NRC was organized to succeed to the function of licensing industrial and commercial uses of atomic energy. The functions originally encompassed by the AEC thus were split, with roles relating to government owned facilities transferred to the DOE and roles relating to the licensing of commercial activities transferred to the NRC.

The ERA was enacted with four titles. Title I is devoted to the creation and responsibilities of the DOE; Title II, to the creation and responsibilities of the NRC; Title III, to miscellaneous transitional provisions; and Title IV, to the prohibition of sex discrimination under the entire ERA, as it applies to both the DOE and the NRC. The whistle-blowing provision in question, § 210, was added to Title II (devoted to the NRC) by an amendment adopted in 1978. Pub.L. 95–601, 92 Stat. 2947, 2951 (1978). That amendment was part of a bill entitled "Authorization, Appropriations—*Nuclear Regulatory Commission,* Fiscal Year 1979" (emphasis added).

---

**2.** The functions of the Energy Research and Development Administration were transferred to the DOE on its creation in 1977 by the Department of Energy Organization Act, 42 U.S.C. § 7101 *et seq.*

From this gross overview, therefore, it appears that Congress was deliberate in assigning all provisions relating to the NRC to Title II and likewise, when amending Title II, by including the amendment (§ 210) in an appropriations bill limited to the NRC. The significance of the separate functions of the DOE and the NRC in Titles I and II, respectively, is highlighted by the decision to include provisions prohibiting sex discrimination in Title IV, which was applicable to both the DOE and the NRC. Thus, if Congress had intended to make the whistle-blower provision applicable to both the DOE and NRC, it could have amended Title IV, not Title II. The consciousness of the arrangement selected is further supported by the fact that at the time that § 210 was enacted (1978), the DOE already had in effect its own internal provisions protecting whistle-blowing activities. The predecessor provisions of DOE Order 5483.1A were adopted in January 1977, a year before § 210 was enacted. *See* Occupational Safety and Health Program for ERDA GOCO [government-owned, contractor-operated] Contractor Employees, Ch. 0506, ERDA Manual, approved Jan. 5, 1977.

A closer reading of § 210 further reveals an interpretation that is harmonious with the statutory structure. Whenever the ERA refers to the "Commission," it is referring to the NRC, and whenever it refers to the DOE (or the Energy Research and Development Administration, its former name), it uses the term "the Administrator." Nowhere does § 210 of the ERA, however, refer to "the Administrator" or the DOE.

In a similar vein, the complaint procedure alludes only to the NRC and not the DOE. Section 210 provides for the filing of a complaint with the Secretary of Labor by an aggrieved employee. On receipt of the complaint, the Secretary must notify only the "Commission." If the section was intended also to govern employees of DOE contractors, one would expect that the provisions would also require that notice be provided to the DOE or the "Administrator."

Finally, the "including" clause that modifies the term employer ("no employer, *including* a Commission licensee, an applicant for a Commission license, or a contractor or subcontractor of a Commission licensee or applicant, may discharge an employee....") contains reference only to persons subject to the jurisdiction of the NRC. Again, if DOE contractors were to be included, one would expect inclusion of "a contractor or subcontractor *of the Administrator* or the *DOE*." That the section refers only to NRC-related employers supports an interpretation that DOE contractors were not intended to be included. *Expressio unius est exclusio alterius* (the mention of one amounts to the exclusion of the other). *See Passenger Corp.*, 414 U.S. at 458, 94 S.Ct. at 693. The contention by petitioners that this interpretative tool is not normally used for terms following the word "including," *see Sutherland Statutory Construction* § 47.23, at 194 (4th ed. 1984), is not persuasive in the context of this statutory provision where the particularized listing identifies a consistent class of persons related only to the NRC and NRC licensees, thus tending to restrict the general term "employer." *See Sutherland* § 47.17, at 166 (under principle of *ejusdem generis*, if legislature intended the general word to be used in its unrestricted sense, no mention would have been made of the particular words).

Petitioners argue that the word "including" does not lend itself to the interpretation we make because by definition it is intended only to provide examples of persons protected, but without limitation. *See Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100, 62 S.Ct. 1, 4, 86 L.Ed. 65 (1941) (" 'including' is not [a term] of all-embracing definition, but connotes simply an illustrative application of the general principle"). *Accord, Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 189, 61 S.Ct. 845, 850, 85 L.Ed. 1271 (1940). As petitioners observe, the term "including" is perhaps more often than not the introductory term for an incomplete list of examples. Thus, when we say that several colors, "including red, blue and yellow" are in the rainbow, we are giving only examples,

and we do not mean that the rainbow does not include other colors. In that sense, an "including" clause is illustrative. However, the term "including" can also introduce restrictive or definitional terms. If we say that "all licensed drivers, including *applicants* for driver's licenses, shall take an eye exam," the word "including" means "and" or "in addition to." That meaning is derived from the fact that a "licensed driver," by definition, excludes an "applicant," and therefore if we intend to include applicants we must say so. The inconsistency between the general word and the specific leads to an interpretation, under principles of *ejusdem generis*, that the general may be defined by the specific. *See Sutherland* § 47.17, at 166.

So, too, in the applicable clause of § 210, the word "including" cannot be illustrative. If we were to construe the term "employer" in § 210 broadly and without consideration of the "including" clause, some limitation would nevertheless have to apply to restrict the term to a person connected with a nuclear or energy facility, such as an owner, a licensee, or a contractor. We could never construe the term "employer" to include any person who is not, or not yet, connected with such a facility. Thus, the term "applicant," who is one not yet a licensee or contractor, would not be an example of an "employer." Rather, its inclusion would require further definition. We conclude, therefore, that the phrase "no employer, including ... an applicant for a Commission license, etc." is the equivalent of saying "no employer, *by which we mean to include* an applicant etc." Clearly, the "including" phrase does more than merely provide examples.

Thus, because the "including" clause which follows the term "employer" is not meant to be illustrative, but rather definitional, its reference to a class related only to the NRC restricts the scope of the term "employer" to NRC-related persons and at the same time expands the term to include applicants of NRC licenses. We conclude that Congress, by so defining "employer," intended to exclude employees of DOE contractors. Only this interpretation is consistent with the placement of § 210 in Title II, which is devoted only to the NRC, and the complaint procedure of § 210(b).

Both sides rely on the legislative history to support their positions, but that, too, is ambiguous and provides no reason to question our conclusion. The petitioners refer to the Senate Report, which describes the applicability of § 210 to cover employees, without qualification. The Report provides:

This provision adds a new section to the Energy Reorganization Act of 1974. This section offers protection to employees who believe they have been fired or discriminated against as a result of the fact that they have testified, given evidence, or brought suit under that Act or the Atomic Energy Act....

\* \* \* \* \* \*

Any worker who is called upon to testify or who gives information with respect to an alleged violation of the Atomic Energy Act or a related law by his employer or who files or institutes any proceeding to enforce such law against an employer may be subject to discrimination.

Sen.Rep. No. 848, 95th Cong. 1st Sess. at 29–30, 1978 U.S.Code Cong. & Admin.News 7303–04. The petitioners point out that the NRC is not even mentioned in the Senate Report and there is no restriction on the definition of the term "employer" or "employee." They argue that the idea conveyed is that all whistle-blowers connected with atomic energy are protected by the amendment. On the other hand, the respondents note that the bill, which originated in the Senate, was agreed to by the House Conference Committee, and the House Conference Report describes the protection as extending only to employees of the NRC:

The Senate bill amended the Energy Reorganization Act of 1974 to provide protection to employees of *Commission* licensees, applicants, contractors, or subcontractors from discharge or discrimination for taking part or assisting in administrative or legal proceedings of the Commission.

H.R.Conf.Rep. No. 1796, 95th Cong., 2nd Sess. 16–17, 1978 U.S.Code Cong. & Admin.

News 7309 (emphasis added). A conference report, being a joint statement by the House and Senate managers of a bill, is generally more elucidating on Congressional intent because it represents the last explanation of the statutory terms agreed upon. *See Norfolk & Western Ry. Co. v. Roberson,* 918 F.2d 1144, 1148 n. 3 (4th Cir.1990). Petitioners, however, argue that less weight should be given to this conference report because the House bill did not contain the whistle-blower provision and the House conferees adopted the Senate version without change. Since the conference did not become involved in resolving any differences of language on this provision, less weight might appropriately be given to the conference report. Other references by the parties to legislative history provide no better basis for resolving the legislative ambiguity.

The statutory interpretation adopted by the Secretary of Labor and the DOE, that § 210 protects only employees of NRC licensees and their contractors and not employees of DOE contractors, is in our judgment the correct one and certainly therefore a permissible one. Accordingly we affirm the decision of the Secretary of Labor.

AFFIRMED.